John T. KENNEDY, Plaintiff,

v.

UNITED STATES of America, Defendant, Third Party Plaintiff–Appellee,

v.

Harold C. GATEWOOD, Third Party Defendant–Appellant.

No. 91–1657.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 4, 1991.

Decided June 8, 1992.

**414**

Richard C. Clark, Kevin J. Young, Thomas H. MacAdam, Clausen, Miller, Gorman, Caffrey & Witous, Chicago, Ill., for plaintiff.

Eileen M. Marutzky, Asst. U.S. Atty., Office of U.S. Atty., Crim. Div., Chicago, Ill., Gary R. Allen, Jonathan S. Cohen, Sara S. Holderness (argued), Douglas W. Snoeyenbos, Dept. of Justice, Tax Div., Appellate Section, Washington, D.C., for defendant-appellee U.S.

John A. Simonetti (argued), Joel M. Friedman, Grossman & Friedman, Chicago, Ill., for defendant-appellant Harold C. Gatewood.

Before WOOD, Jr.* and CUDAHY, Circuit Judges, and GRANT, Senior District Judge.**

HARLINGTON WOOD, Jr., Circuit Judge.

The Internal Revenue Service assessed a 100–percent penalty against Harold C. Gatewood and John T. Kennedy as responsible persons of a corporation that failed to pay over federal withholding taxes from employee wages. As a result of a miscalculation, an Internal Revenue Service agent represented to Gatewood's attorney that Gatewood and Kennedy owed a lesser amount of taxes than the government now demands. Gatewood and Kennedy paid the lesser amount, but they refused to pay the total amount of the corrected assessment to the IRS. The government pursued its claim against Gatewood and Kennedy in federal district court after Kennedy brought a refund suit requesting the return of approximately $5,000 withheld from his 1988 tax return by the IRS. The district court granted a summary judgment motion in the government's favor for the full amount of the corrected 100–percent assessment. Kennedy then entered into a settlement agreement with the Internal Revenue Service, but Gatewood appeals the assessment imposed against him. Gatewood maintains that the doctrine of equitable estoppel prevents the government from collecting any more money from him. We affirm the judgment of the district court.

## BACKGROUND FACTS

John T. Kennedy and Harold C. Gatewood were shareholders and officers in Data Mailers Midwest, Incorporated ("Data Mailers"). Data Mailers is no longer in business. It is undisputed that during the

---

* Judge Wood, Jr. assumed senior status on January 16, 1992, after oral argument in this case.

** The Honorable Robert A. Grant, Senior District Judge of the Northern District of Indiana, is sitting by designation.

second and third quarters of 1988 Data Mailers failed to pay over federal income and social security taxes withheld from employee wages. The company's attorney, Joel Friedman, contacted the Internal Revenue Service ("IRS") in an attempt to resolve Data Mailers's outstanding tax liabilities. Friedman calculated that Data Mailers owed $23,382.20 with respect to trust fund taxes, and he wrote a letter dated October 18, 1988, to IRS Agent Zinazeah proposing to settle for this amount. Later, the case was assigned to another revenue officer, John Mullvihill, an IRS Revenue Officer who had worked on approximately one thousand payroll tax cases prior to the Data Mailers case. Friedman again submitted the $23,382.20 figure as the amount of deficiency Data Mailers owed, and Mullvihill concurred after duplicating Friedman's calculations the next day. It is now undisputed that these calculations were incorrect.

Although he had incorrectly affirmed Friedman's calculations of Data Mailers's payroll tax deficiency, Mullvihill advised Friedman by phone on January 25, 1989, that Data Mailers's total outstanding liability for the second quarter of 1988 was $23,382.20 and that Data Mailers owed nothing for the third quarter. Mullvihill also told Friedman the IRS would accept payments totalling $23,382.20 in satisfaction of all potential 100-percent penalties for the second quarter of 1988 and no penalties relating to the third quarter would be imposed. Mullvihill then sent Friedman an IRS Installment Agreement Form 433–D. After receiving the form, Friedman contacted Mullvihill to tell him that Form 433–D was unacceptable to effect settlement because it did not prohibit the IRS from assessing additional 100–percent penalties against Gatewood or Kennedy for further payroll tax withholding liabilities. Friedman requested a closing agreement and a guarantee relating to trust fund taxes for the quarters ending June 30, 1988, and September 30, 1988, which would protect Kennedy and Gatewood from any further 100–percent penalty assessments. In response Mullvihill told Freidman he would check with IRS Special

Procedures Function about the necessity of a closing agreement. After consulting Special Procedures, Mullvihill called Friedman and passed on what he had learned from an IRS Special Procedures Function Advisor. Mullvihill informed Friedman that a closing agreement was not necessary, that a closing agreement was a long, drawn-out affair and that the quickest way to consummate a final binding assessment was by the issuance of an IRS Proposed Assessment of 100–Percent Penalty, Form 2751. Mullvihill also told Friedman there would be no additional 100–percent penalties or tax assessments relating to the second and third quarters of 1988 if the $23,382.20 was paid.

When Friedman received Form 2751 from Mullvihill bearing the miscalculated assessment of Data Mailers's trust fund liability and referring only to tax liabilities for the second quarter of 1988, he made some modifications. First, Friedman added a line indicating zero liability for the third quarter of 1988. Then he inserted the following sentence on the form: "The above constitutes full and final assessment of the 100 percent penalties for the periods indicated." Both Kennedy and Gatewood signed the form, and Friedman returned the form to Mullvihill on February 7, 1989, with a cashier's check for $11,691.10, half the penalty. Friedman subsequently sent the IRS two cashier's checks in the amount of $3,897.03, representing two of three monthly installment payments, on February 17, 1989, and March 14, 1989.

Mullvihill's (and Freidman's) error in calculating Data Mailers's tax withholding assessment was discovered by a revenue officer aide who completed Data Mailers's penalty assessment process at Mullvihill's request. The aide recalculated the assessment in accordance with the Internal Revenue Manual; the correct assessment totalled $52,043.70. Mullvihill and Friedman had failed to first apply the federal tax deposits to the employer's share of FICA tax, which is not part of trust fund liability and cannot be collected from responsible persons. Mullvihill and Friedman subtracted the deposits from the total liability to

reach the erroneous assessment for the second quarter of 1988 and to conclude that there was no trust fund liability for responsible persons of Data Mailers for the third quarter.

On March 13, 1989, the aide sent another Form 2751 and a letter to Gatewood and to Kennedy informing them of the proposed assessment. Friedman immediately called Mullvihill after receiving the letter. Mullvihill explained that the new forms were sent because both Kennedy and Gatewood had signed one Form 2751 when they were required to sign separate forms. Friedman agreed to send Mullvihill two copies of Form 2751 for Gatewood and for Kennedy. Later on April 20, 1989, Friedman sent to the IRS the final installment on what he believed to be the full assessment of Data Mailers's tax withholding liability.

On October 16, 1989, and on October 30, 1989, the IRS assessed a 100–percent liability against Gatewood and Kennedy respectively pursuant to 26 U.S.C. § 6672 for unpaid federal withholding taxes due for the second and third quarters of 1988. The assessment totalled $52,043.70. Section 6672 allows the IRS to assess a penalty against a "responsible person" who willfully fails to collect and pay over tax due under other provisions of the tax code. Both Kennedy and Gatewood refused to pay, averring that they had already sent in the full assessment as represented to them by Mullvihill.

Kennedy, on May 22, 1990, brought a refund suit in the United States District Court for the Northern District of Illinois requesting the return of $5,150.30 withheld from his tax return by the IRS for Data Mailers's unpaid withholding taxes and seeking abatement of the 100–percent penalty assessment against him. The United States filed an amended answer and asserted counterclaims against Kennedy for $46,893.40 plus interest and against Gatewood for $28,679.51 plus interest. In his answer to the government's counterclaim, Gatewood asserted two affirmative defenses, equitable estoppel and accord and satisfaction. The United States then moved for summary judgment against Gatewood for

$45,370.89. In responding to the government's motion, Gatewood reasserted equitable estoppel and accord and satisfaction. Gatewood also questioned the government's assessment against him, which had risen from $28,679.51 to $45,370.89. The change in assessment came from a reallocation of the money Friedman sent to the IRS, money which Friedman believed to extinguish Gatewood's and Kennedy's tax liabilities. Originally, the entire $23,382.20 was credited to Gatewood's account. The new assessment against Gatewood reflected that half the $23,382.20, or $11,691.10, was credited to Gatewood's account and to Kennedy's account. The United States denied that a valid settlement existed and maintained that Mullvihill did not have the authority to enter into a settlement agreement. Gatewood's alleged reliance on Mullvihill's representations was, the government asserted, unreasonable by definition.

On December 27, 1990, the district court granted the government's motion for summary judgment. As to Gatewood's estoppel defense, which is at issue in this appeal, the court stated Gatewood's reliance on Mullvihill's representations regarding the satisfaction of the 100–percent liability with a $23,382.20 payment was unreasonable since Mullvihill was not authorized to enter into a settlement agreement and since Mullvihill's representations contradicted the statutory provisions for settlement. The court further decided that even if Gatewood's reliance on Mullvihill's representations had been reasonable, Gatewood did not establish that he was substantially harmed. The court also rejected Gatewood's accord and satisfaction argument.

Judgment was entered on December 31, 1990, in the government's favor in the amount of $45,370.89. On January 4, 1991, Kennedy and the IRS entered into a settlement agreement. Kennedy relinquished his claim for a $5,150.30 refund and his claim to half the money Friedman sent to the IRS—$11,691.10. In return, the government entered into a settlement agreement with Kennedy releasing Kennedy from any and all liabilities or claims against him as a person responsible for

Data Mailers's taxes. In order to account for Kennedy's payments to the IRS, Gatewood moved to amend the judgment against him to $26,967.98. The court granted this motion on February 12, 1991. The government then moved to amend the judgment in its favor to $26,967.98 including interest accruing after January 11, 1991. On January 29, 1991, the district court entered the amended order of judgment. Gatewood appealed.[1]

## ANALYSIS

■ Gatewood's equitable estoppel argument was resolved in favor of the government in a summary judgment motion. We review issues decided on summary judgment *de novo*, and we resolve all reasonable inferences in favor of the non-moving party. *Mendrala v. Crown Mortgage Co.*, 955 F.2d 1132, 1139 (7th Cir. 1992). Gatewood maintains that a genuine material issue of fact exists as to his claim of equitable estoppel against the government. Equitable estoppel is a doctrine which precludes one party from asserting a claim or defense against another party who has detrimentally altered her position in reliance on the former's misrepresentation or failure to disclose a material fact. *Portmann v. United States*, 674 F.2d 1155, 1158 (7th Cir.1982). Although the traditional view is that equitable estoppel may not be asserted against the government on the same terms as any other litigant, the Supreme Court has left open the question of whether to expand this general principle into a flat rule that estoppel may not lie against the government in any case. *See Heckler v. Community Health Services, Inc.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). This court, along with several other circuits, allows a private party to assert equitable estoppel against the government in a very narrow category of cases—when the traditional elements of estoppel are shown and there is affirmative misconduct on the part of the government. *See United States v. Asmar*, 827 F.2d 907,

911 n. 4 (3rd Cir.1987) (noting that the First, Second, Seventh and Ninth Circuits have adopted tests requiring affirmative misconduct on the part of government officials).

In challenging the government's assessment of a 100-percent penalty against him under 21 U.S.C. § 6672, Gatewood does not deny that he is a "responsible person" under Section 6672, nor does Gatewood deny that he willfully withheld money from the IRS. Therefore, the government's liability assessment is presumed valid. *Ruth v. United States*, 823 F.2d 1091, 1093 (7th Cir.1987). Gatewood argues only that the assessment is improper because the government entered into an agreement with him to settle the liability for less than the government is now asking.

■ The traditional elements of equitable estoppel are: (1) misrepresentation by the party against whom estoppel is asserted; (2) reasonable reliance on that misrepresentation by the party asserting estoppel; and (3) detriment to the party asserting estoppel. *See In re Larson*, 862 F.2d 112, 115 (7th Cir.1988) (quoting *United States v. Asmar*, 827 F.2d 907, 912 (3rd Cir.1987) ). The burden of proof is on the party claiming estoppel. *Id.* Gatewood claims that a genuine issue of material fact exists as to each traditional element, as well as to the issue of affirmative government misconduct, which this circuit requires to be shown before a claim of equitable estoppel against the government will be entertained. If summary judgment in favor of the government is appropriate for any factor of the theory, the entire theory fails.

Gatewood has evidently established the first element of traditional equitable estoppel. The government does not dispute that Mullvihill mistakenly represented to Friedman the amount of Gatewood's (and Kennedy's) liability to the IRS. However, while the first element of equitable estop-

---

**1.** Gatewood appeals only the district court's denial of his equitable estoppel argument. As he does not challenge the district court's decision regarding his accord and satisfaction argument

or the validity of the IRS's assessment of his liability based on the adjustments made to the amount, we treat them as waived.

pel is satisfied in this case, Gatewood's estoppel claim fails at least one of the other three factors which must be met to successfully maintain an estoppel claim against the government. Therefore, the district court's granting of the government's summary judgment motion was appropriate. We will first examine Gatewood's assertion of detriment, then the reasonableness of Friedman's reliance on Mullvihill's representations, and finally Gatewood's assertions regarding the government's "affirmative misconduct" in this case.

The district court spent little time discussing the detriment element of Gatewood's claim, concluding that at most the conversations between Friedman and Mullvihill produced Friedman's mistaken belief that a payment of $23,382.20 would extinguish his clients' tax liability. The district court pointed out that the conversations did not increase Gatewood's and Kennedy's liability, nor did it affect the IRS's eventual assessment. The district court stated that the alleged agreement created at most "false hope."

■ One key principle of equitable estoppel is that the party claiming the theory must demonstrate reliance on its adversary's conduct "in such a manner as to change his [or her] position for the worse." *Heckler*, 467 U.S. at 59, 104 S.Ct. at 2223. In the *Heckler* case Community Health Services of Crawford County, a charitable health care provider, contacted an agent of the Department of Health and Human Services to ask whether certain services provided for Medicare patients were reimbursable as reasonable Medicare expenses. The agent, Travelers Insurance Company, erroneously advised Community Health Services by phone that the expenses were reimbursable, and Community Health Services received reimbursements to which it was not entitled for several years. Later, Travelers discovered its mistake and requested Community Health Services to return the overpayment. In holding that Community Health Services could not estop

the government from requiring repayment, the Supreme Court determined Community Health Services's detriment was the inability to retain money it should never have received in the first place. The *Heckler* Court stated there was "no legal right either vested or contingent nor any adverse change in circumstances" that could be characterized as detrimental reliance. 467 U.S. at 61–62, 104 S.Ct. at 2225.

The case before us is similar to *Heckler* in that Gatewood received a benefit he should never have received in the first place. Gatewood's benefit was his belief that his liability to the IRS was discharged for less than he actually owed. But, it is undisputed that Mullvihill and Friedman miscalculated the assessment Mullvihill originally told Friedman was due, and it is also undisputed that a settlement agreement cannot be effectuated through the process Mullvihill and Friedman attempted to use. Gatewood can claim no legal right to the $23,382.20 assessment at which he now seeks to hold the government; therefore, he suffers no detriment by its loss. Gatewood is no worse off as a result of Mullvihill's representations than he would be if those representations were never made. Gatewood simply seeks to take advantage of a mutual mistake—both Gatewood's attorney and Revenue Officer Mullvihill erroneously believed that Gatewood and Kennedy owed less than they actually owed as responsible persons of Data Mailers. If we were to allow Gatewood to use the estoppel theory to hold his liability to the government at approximately $23,000, instead of approximately $52,000, in order to create an adverse change in his position, we would be allowing him to bootstrap himself into the estoppel claim. This is because Gatewood was clearly liable for an amount greater than Mullvihill initially represented to Friedman was owed (by confirming Friedman's own faulty calculations of Gatewood's liability) and because Gatewood, like any taxpayer, is not entitled to a settlement agreement of tax liability as a matter of right.[2] We do not believe the

**2.** General fairness concerns may weigh more heavily in favor of estoppel against the govern-

ment when the government's misrepresentations cause an individual to lose a statutory

estoppel doctrine should be used against the government when the estoppel claimant's detriment is the loss of a windfall that could have never been statutorily effectuated through the process the claimant attempted to use.

Gatewood also claims detriment by arguing he was induced by Mullvihill's misrepresentations to surrender his property to the government by voluntarily paying the IRS $11,690.10 (his half of the erroneous assessment) instead of contesting the taxes. We are extremely doubtful that voluntary payment of lawfully incurred taxes is a detriment for purposes of estoppel analysis, and we have said so in the past. *See Gressley v. Califano,* 609 F.2d 1265, 1267 n. 2 (7th Cir.1979). Moreover, we fail to see how Gatewood relinquished his right to contest the IRS's assessment of his liability by entering into a "settlement agreement" with Mullvihill. After the IRS notified Gatewood by letter of the correct assessment, Gatewood had 30 days to send a written protest to the Regional Director of Appeals of the Internal Revenue Service. After 30 days, the letter states the IRS would assess the penalty. The letter further states that Gatewood could seek a refund of taxes paid in federal court if he still had a disagreement with the IRS for up to 2 years after the disallowance of his claim. The record indicates that a protest letter was sent to the Chicago Appeals Office, and the protest was considered deficient. Once his appeal was rejected by the IRS, Gatewood then had the right to seek a refund in federal court after paying the assessment if he was still in disagreement with the IRS concerning his assessment. Mullvihill's erroneous advice did not cause Gatewood to take any action or fail to take any action that Gatewood could not correct at a later time. So, Gatewood suffered no detriment by paying what he did instead of immediately contesting the taxes. *See Schweiker v. Hansen,* 450 U.S. 785, 789,

101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981) (per curiam).

Although we could dispose of this case on the detriment issue alone, we also believe there is a strong argument that summary judgment is warranted because Friedman's reliance on Mullvihill's representations concerning the discharge of Gatewood's liability was not reasonable. The government argues Gatewood was plainly unreasonable in relying on Mullvihill because Mullvihill was not statutorily authorized to enter into a closing agreement relating to or a compromise of Gatewood's tax liability. Settlements of tax disputes with the IRS are governed by the provisions of 26 U.S.C. § 7121 and 26 U.S.C. § 7122, which pertain to closing agreements and compromises respectively.

Section 7121(a) states: "The Secretary is authorized to enter into an agreement in writing with any person relating to the liability of such person (or of the person or estate for whom he acts) in respect of any internal revenue tax for any taxable period." Section 7122(a) reads: "The Secretary may compromise any civil or criminal case arising under the internal revenue laws prior to reference to the Department of Justice for prosecution or defense; and the Attorney General or his delegate may compromise any such case after reference to the Department of Justice for prosecution or defense." The authority of the Secretary under sections 7121 and 7122 is delegated. During the time period relevant to this case, the Secretary's authority to enter into a closing agreement was delegated to IRS employees of different classifications (including Regional Directors of Appeals, Associate Chiefs of Appeals Offices, and Appeals Team Chiefs in certain cases); however, the delegation order applicable to this case does not include employees at the Revenue Officer level, like Mullvihill. *See* IRS Delegation Order No. 97 (Rev. 26), effective date February 29, 1987. Similar-

---

benefit to which that person would have been entitled but for the government's misrepresentations. *See* Comment, *Unauthorized Conduct of Government Agents: A Restrictive Rule of Equitable Estoppel Against the Government,* 53 U.Chi.L.Rev. 1026, 1042 (1986). Indeed *Heckler* can be interpreted to require an estoppel claimant to demonstrate he or she was statutorily entitled to a benefit before the claimant can argue detriment from loss of the benefit at the government's hands.

ly, the Secretary's compromise authority under section 7122 is delegated, but it was not delegated to Revenue Officers during the time relevant to this case. *See* IRS Delegation Order No. 11 (Rev. 18), effective date May 10, 1988.

Although it clear that Mullvihill did not have the requisite authority to enter into any type of settlement agreement on the government's behalf with Gatewood's counsel, Friedman, Gatewood argues that it was reasonable for Friedman to believe that Mullvihill's representations were correct because Mullvihill, not Friedman, was in the best position to know of the correct procedures. This argument carries the force of common sense—one might expect an IRS Revenue Officer to be more likely than the average citizen who calls the officer for information to know what procedures are required to effectuate a settlement agreement with the IRS. Moreover, one would expect Mullvihill to know whether or not he was delegated the authority to settle a tax dispute. In fact, Mullvihill testified in a deposition he was aware that he did not have the authority to enter into a settlement agreement. He believed he was consummating a 100–percent assessment, an assessment which was later discovered to be incorrectly calculated.

Balanced against Gatewood's "common sense" argument is another principle of common sense. That principle being the fact that "government could scarcely function if it were bound by its employees' unauthorized representations." *Gressley*, 609 F.2d at 1267. Congress outlined the method by which settlement agreements between the IRS and taxpayers are to be consummated, and Congress's legislative authority should not be subordinated to the act of an unknowledgable administrative official. *See Schuster v. Commissioner of Internal Revenue*, 312 F.2d 311, 317 (9th Cir.1962). The separation of powers rationale is a powerful justification for exempting the government from estoppel. The argument is that to permit equitable estoppel against the government effectively allows government employees to "legislate" by misinterpreting or ignoring applicable statutes, and subsequent judicial validation

of such unauthorized "legislation" then infringes upon Congress's exclusive constitutional authority to make law. *See Portmann*, 674 F.2d at 1159. Of course, this principle, like Gatewood's argument, also proves too much because it would seem to exempt the government from equitable estoppel in *any* case—including those cases in areas such as government procurement, where the government has long been subject to estoppel principles, *see id.*, and cases in which government employees' conduct falls into the category of "affirmative misconduct" that should not be readily overlooked. *See Heckler*, 467 U.S. at 60–61, 104 S.Ct. at 2224 ("[there may be cases] in which the public interest in ensuring that the Government can enforce the law free from estoppel may be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government").

The Supreme Court stated in *Heckler* that "anyone entering into an arrangement with the government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." 467 U.S. at 63, n. 17, 104 S.Ct. at 2225, n. 17. This statement clearly militates against Gatewood's common sense argument that Mullvihill was in a better position than Gatewood's attorney, Freidman, to know of the proper procedure for obtaining a settlement agreement from the IRS. The proper procedure for entering into a closing agreement with the IRS could be found in 26 U.S.C. § 7121. (Section 7121, and not the section for compromises, section 7122, was the applicable section at the time Friedman initially called Mullvihill, as no suit had been instituted against Gatewood.) The text of section 7121 was surely accessible to Friedman, an attorney. The delegation order listing those who were authorized to enter into settlement agreements on the Secretary of the Treasury's behalf may not have been as easily accessible as a volume of the United States Code, but it was still "on the books." Even if Freidman believed that Mullvihill should have known of the proper procedures for entering into a set-

tlement agreement with him, it is not unreasonable to expect an attorney to do some research into the statutory requirements of a settlement agreement between his client (the taxpayer) and the IRS.[3] Therefore, we cannot characterize Friedman's reliance on Mullvihill's erroneous advice as reasonable.[4]

Last, we turn to the issue of affirmative misconduct. The district court did not make a specific finding as to whether Mullvihill's conduct constituted affirmative misconduct. The court did state that "Mullvihill's actions needlessly complicated an otherwise straightforward tax liability matter." Memorandum Opinion and Order at 12, 1990 WL 251852 at *5. The government urges us to find, as a matter of law, that Mullvihill's actions in this case did not constitute affirmative misconduct. The Supreme Court has yet to define "affirmative misconduct." This circuit, citing *TRW, Inc. v. Federal Trade Com.*, 647 F.2d 942, 951 (9th Cir.1981), has stated that affirmative misconduct is "something more than mere negligence." We agree with Judge Conlon that Mullvihill's actions unnecessarily complicated this issue, and we also note that Mullvihill did not act alone. Mullvihill was advised by Special Procedures, *after* Friedman requested a closing agreement, to tell Friedman that a closing agreement was going to be a long, drawn-out affair and that the quickest manner to consummate a final and binding settlement would be to assess the 100–percent penalty by the issuance of Internal Revenue Form 2751 Proposed Assessment of Penalty. The latter portion of this advice compounded Mullvihill's original mistake since a taxpayer must execute a proposed agreement on Internal Revenue Service Form 866 in order to enter into a closing agreement with the IRS, not Form 2751. *See* 20 Fed.Proc., L.Ed. § 48:722. In his deposition, Mullvihill offered an unacceptable excuse for the conduct of IRS agents in this case that the IRS "was in a rush to get the money." Whether or not the conduct of the IRS agents in this case constituted "affirmative misconduct," summary judgment in the government's favor is still warranted as we have already determined that Gatewood has not met two out of the three traditional elements of estoppel. *See Heckler* (Court found it unnecessary to consider affirmative misconduct because the traditional elements of estoppel, namely detriment, had not been met).

The parties shall bear their own costs.

## CONCLUSION

The district court's grant of summary judgment in favor of the United States is AFFIRMED.

---

3. This situation can be distinguished from a situation such as that presented in *Johnson v. Williford*, 682 F.2d 868 (9th Cir.1982). In *Johnson*, the estoppel claimant succeeded in preventing the government from denying him parole. The government claimed that Johnson was convicted and sentenced under a federal statute that did not allow the possibility of parole; however, neither the sentencing report nor the initial sentencing computation noted this. Johnson was released on parole after numerous reviews. When the error was discovered over a year later, Johnson was arrested and his parole revoked. The government argued that Johnson should be charged with constructive knowledge of the statute he was charged and convicted under, but the court of appeals disagreed. Because the government had misapplied or misinterpreted the statute in eight separate reviews in Johnson's case, the court refused to charge Johnson with constructive knowledge of the statute's proper meaning.

4. The government also persuasively argues, citing *Heckler*, that in cases involving the public fisc, it is especially important to prevent taxpayers from relying on the conduct of government agents contrary to law. *See Heckler*, 467 U.S. at 63, 104 S.Ct. at 2225. In *Heckler*, the petitioner, a health care provider, sought to retain a government grant it should never have received. Here, Gatewood attempts to hold his tax liability at less than he lawfully owes as a result of his own attorney's and the government's mutual mistake, thereby receiving a windfall to which he is not entitled. As such he is "spending" the government's money in a sense by refusing to pay to the government what it is statutorily entitled to receive. *See also Office of Personnel Management v. Richmond*, 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) (holding there can be no estoppel against the government by claimant seeking public funds not otherwise authorized by law).