The BOARD OF EDUCATION OF DOWN-
ERS GROVE GRADE SCHOOL DIS-
TRICT NO. 58, Plaintiff,

v.

STEVEN L. and Christine L., individ-
ually and as parents of Andrew
L., a minor, Defendants.

No. 93 C 7168.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 24, 1995.

Leo J. Athas, Athas, Foley, Kowal & Bridge, Donna Ann Hickstein–Foley, Foley and Foley, Chicago, IL, for plaintiff Board of Education of Downers Grove Grade School District No. 58.

Nancy Hablutzel, Nancy Hablutzel & Associates, Margo Lynn Hablutzel, Hablutzel & Associates, Chicago, IL, for defendants Steven L., Christine L., individually and as parents of Andrew L.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

In this case, we are asked to determine the obligations under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA" or "the Act"), of the Plaintiff school district ("School District") in providing a child with learning disabilities ("Andrew L.") a "free appropriate education." The School District appeals the decision of the state educational agency's Level II hearing officer which found that under the IDEA, the School District's proposed November, 1992 individual educational program ("IEP") would not appropriately address the Andrew L.'s fifth grade special education needs. The School District contends that the hearing officer misapplied the legal standards under the Act. At issue is whether the School District must provide direct special education instruction in reading to a child with learning disabilities who is receiving consultative services to enhance his regular education reading curriculum, who is performing at grade level in reading, and who is receiving direct special education instruction in other areas. For the reasons stated below, we conclude that the school district does not have to provide the direct reading instruction. The parties filed cross motions for summary judgment. This Court grants the Plaintiff's motion and denies the Defendant's motion.

## I. BACKGROUND

The following facts are not in dispute. Andrew L. will enter the eighth grade this fall at Herrick Middle School in DuPage County. Since 1992, Andrew L. has been receiving special education and related services in reading and written language. In November, 1992, when Andrew L. was in the fifth grade, the School District proposed reducing Andrew L.'s special education instruction from 225 minutes of direct services to 150 minutes of direct and thirty minutes of consultative services. The seventy-five minute per week reduction in services would come about by Andrew L.'s placement full time in a regular education reading curriculum. He was already in regular education classes in math, science, and social studies. After Andrew L.'s parents objected to the reduction, two administrative hearing officers denied the School District's proposal.

Testimony and documentary evidence produced at the Level I and Level II hearings described Andrew L.'s assessed special education needs and the School District's response. We reproduce the Level II hearing officer's findings of fact that relate to the proposed change in special education reading instruction.

1. "A", an eleven year old boy of above-average cognitive ability, has been evaluated to have specific learning disabilities.

2. According to an evaluation, dated October 15, 1990, by Dr. Marjorie Getz and Dr. Joseph Vaal, "A"'s academic weakness, most significant in the area of reading, is apparently due to both a subtle processing weakness and some attentional difficulties. There was also a neurological diagnosis of attention deficit. In addition, there were found to be some secondary behavior patterns such as avoidance that were indicated might be problematic in the classroom. While school staff report the student is not now easily distractible, he does take medication for hyperactivity.

\* \* \* \* \* \*

4. Dr. Joseph Vaal has recommended and the parents also want the school to employ a metacognitive approach which emphasizes the development of skills for understanding how one learns or does not learn. They believe this is the best approach for working with "A"'s areas of deficit.

\* \* \* \* \* \*

7. "A" has not been offered the use of a tape recorder as an alternative to notetaking, for discussions or lectures in the classroom, but has used a tape recorder on tests. On several occasions when school staff has offered "A" the use of a tape recorder, he has refused to use it. Staff suggests that "A" is not shy and may not want to use the tape recorder because he does not want to appear different from the other students and that the use of such technologies must be balanced by the need to protect "A"'s self-esteem. On the other hand, Dr. Vaal indicated "A" might not use a tape recorder if he did not understand how much he needs it. Both inferences are reasonable.

8. The school district believes termination of direct reading services, substituting monitoring of "A"'s reading instruction in the regular classroom, is warranted by the fact that "A"'s functioning has come up to grade level in some areas, including reading, although in some areas he is still behind and although his capacity is higher than average.

(Level II Opinion at 5–7).

We add the following observations from our review of the record. The parents of Andrew L. approved of the content of the April, 1992 IEP that was in effect when the School District proposed the November, 1992 IEP. The proposed November, 1992 IEP would maintain direct services in written language and organizational development that existed in the April, 1992 IEP, and would result in a reduction of reading services only.

The basis for the statement in finding number two that Andrew L.'s academic weaknesses were most significant in the area of reading was that his performance on several reading achievement tests was inconsistent with his documented congnitive abilities. The test results implied that "Andrew processes information better when he is able to use information from multiple sources simultaneously, as well as being able to use multiple processing channels simultaneously." (R. at 15).

The unrebutted testimony of School District personnel about why they believed he could succeed in the regular education reading program was that several sets of reading achievement test results showed that Andrew L. was reading at grade level, commensurate with his peers. (R. Level I at 265). They also testified that Andrew L. was achieving A's and B's in all his courses, that he had made consistent gains year to year in his performance on standardized test results so that he was performing at average to above average, and that his special education teacher had observed absolute growth in his abilities. (R. Level I at 218–219). His regular education reading teacher had never seen him regress. (R. Level I at 161). Before receiving special education services, Andrew L. was reading below grade level at first grade third month when he was in the second grade second month. (R. Level I at 289). At the time the IEP modification was proposed, Andrew L. was reading above grade level at fifth grade ninth month when he was in the fifth grade third month. (R. Level I at 289).

Among the accommodations made to address Andrew L.'s processing weaknesses were access to a computer for written language, (R. Level I at 211); the use of a writing process involving webbing, pre-writing, and editing, (R. Level I at 219); the taping of reading lessons, (R. Level I at 211); the systematic performance of oral comprehension checks (R. Level I at 211); and multi-sensory techniques for the whole class, such as overheads, filmstrips, chalkboard, and artwork, (R. Level I at 158). Plans were also in place for Andrew L.'s special education teacher to consult regularly with his regular education reading teacher on successful strategies for helping him with the curriculum. (R. Level I at 155, 210). The record does not reflect that these accommodations would have been removed under the November, 1992 IEP. Andrew L.'s mother had no doubt that the November, 1992 IEP would be implemented properly if it ever went into effect. (R. Level I at 102).

## II. DISCUSSION

■ The law is well settled concerning a district court's consideration of a motion for summary judgment. Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In determining whether summary judgment is appropriate, the court must view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Kennedy v. United States*, 965 F.2d 413, 417 (7th Cir.1992). Summary judgment is a common vehicle for addressing the merits of an IDEA case in the district court. *See Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir.1994). "Judicial review of administrative action, even when the reviewing court is a single federal district judge rather than a panel of appellate judges, is ordinarily conducted on the basis of the record compiled in the administrative proceeding." *Id.*

### A. Mootness

We pause briefly to consider a question that neither party has raised, yet that this Court feels it must address. The educational program in dispute is the November, 1992 program The School District created to guide Andrew L.'s education during the 1992–93 school year, his fifth grade year. Andrew L. is about to enter the eighth grade. Is this case moot?

■ Other courts have addressed the question under similar circumstances. *See, e.g., Murray v. Montrose County School Dist.*, 51 F.3d 921, 931 (10th Cir.1995); *Sacramento City Unified School District. v. Rachel H.*, 14 F.3d 1398, 1403 (9th Cir.1994); *Daniel R.R. v. Board of Educ.*, 874 F.2d 1036, 1040 (5th Cir.1989). We agree with the conclusion reached by most courts: this case is not moot.

Even if this Court cannot determine what would be the appropriate placement for Andrew L. at this time, "this case presents a live controversy, because the conduct giving rise to the suit 'is capable of repetition, yet evading review.'" *Rachel H.*, 14 F.3d at 1403 (quoting *Honig v. Doe*, 484 U.S. 305, 318, 108 S.Ct. 592, 601–02, 98 L.Ed.2d 686 (1988)). The school district and the parents of Andrew L. have conflicting educational philosophies and perceptions of the mainstreaming and methodological requirements under the IDEA. *See id.* "This conflict is a continuing one and will arise frequently." *Id.* We believe we can adequately inform the parties of the contours of their continuing relationship under the IDEA.

### B. Plaintiff's Motion for Summary Judgment

#### 1. State Requirements under the IDEA

■ The IDEA provides federal funds to states for the education of disabled children. *Board of Educ. v. Rowley*, 458 U.S. 176, 179, 102 S.Ct. 3034, 3037, 73 L.Ed.2d 690 (1982). If a state elects to receive these funds, the state must adopt certain procedures and

practices in the education of the disabled pursuant to the IDEA. The IDEA requires that each disabled child in a cooperating state be provided a "free appropriate education." 20 U.S.C. § 1412(1); *see Rowley*, 458 U.S. at 181, 102 S.Ct. at 3037–38; *Board of Educ. of Murphysboro Community Unit School District No. 186 v. Illinois .State Board of Educ.*, 41 F.3d 1162, 1166 (7th Cir.1994); *see also* 105 ILCS 5/14–8.02. The act further contains what is known as a mainstreaming preference, mandating that states educate disabled children along side non-disabled children "to the maximum extent appropriate." 20 U.S.C. § 1412(5); *See Illinois State Board of Educ.*, 41 F.3d at 1168; *Daniel R.R. v. State Board of Educ.*, 874 F.2d 1036, 1044 (5th Cir.1989); Daniel H. Melvin II, Comment, *The Desegregation of Children with Disabilities*, 44 DePaul L.Rev. 599, 626–43 (1995). The Department of Education has crafted regulations outlining the obligations of local and state educational agencies with respect to the mainstreaming preference, specifying that such agencies must make available a continuum of alternative placements so that disabled children may be placed appropriately in the least restrictive educational environment that would satisfy their educational needs. *See* 34 C.F.R. §§ 300.550–300.556 (1994). The mainstreaming preference requires that "special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(5)(B); *see Illinois State Board of Educ.*, 41 F.3d at 1167–68; *Oberti v. Board of Educ.*, 995 F.2d 1204, 1213 (3d Cir.1993).

An IEP provides the guiding framework under the IDEA for the education of a child with disabilities. Local and state agencies must fashion yearly evaluations of the educational program of those children identified as disabled to aid the formation of each child's IEP. 34 C.F.R. §§ 300.340—300.350; *see Daniel R.R.*, 874 F.2d at 1040. The IEP is a document that must include statements of the child's present levels of educational performance; annual goals, including short-term instructional objectives; the specific special education and related services to be provided to the child and the extent that the child will be able to participate in regular educational programs; dates for the presentation of services; and appropriate evaluation criteria and procedures for ascertaining the program's success. 20 C.F.R. § 300.346.

The IDEA affords several procedural safeguards to insure that a disabled child receives an IEP that will provide a free appropriate education, as defined under the Act. *See* 20 U.S.C. § 1415; 34 C.F.R. § 300.500 *et seq.; Rowley*, 458 U.S. at 182–83, 102 S.Ct. at 3038–39. These include requiring that parents be allowed to participate in the formation of the IEP; requiring proper notice be given to parents about any proposed initiation or change to an IEP; and requiring an opportunity for parents to present complaints on any matter relating to the "identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(1). When a parent has any complaint about a child's IEP, the states must give parents the opportunity to present the complaint to an impartial due process hearing officer. 20 U.S.C. § 1415(b)(1)(E). It is the decision of the hearing officer that comes before us for review.

### 2. Standard of Review

We have jurisdiction under 20 U.S.C. § 1415(e)(2). The standard of review of administrative agency decisions under the IDEA is provided by 20 U.S.C. § 1415(e)(2):

> In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

Neither party has requested that we hear additional evidence. Therefore, based on the administrative record, we must independently determine whether the school district here has satisfied the requirements of the IDEA

with respect to Andrew L.'s November, 1992 IEP.

We recognize that in developing this standard of review, Congress specifically rejected language that would have made state administrative findings conclusive when supported by substantial evidence. *See Rowley*, 458 U.S. at 205, 102 S.Ct. at 3050. Instead, the Supreme Court directed federal courts to give "due weight" to the results of the administrative decisions. "Due weight" implies some sort of deference to the agency's decision, although less deference than would exist under a substantial evidence standard. *Illinois State Board of Educ.*, 41 F.3d at 1167. Even though we have some freedom to weigh the evidence independently, the Supreme Court has admonished federal courts in IDEA cases not to substitute the court's own ideas of educational policy for those of the school authorities because the courts lack special expertise in the area of educational policy. *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3050–51. "[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* We must nonetheless not shy from our responsibility to hold up the record to our own independent judgment and scrutiny to determine whether the state has complied with the IDEA's requirements. *See Illinois State Board of Educ.*, 41 F.3d at 1167; *Oberti*, 995 F.2d at 1214; *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 184 (3d Cir.1988) ("We do not read the Supreme Court's salutary warnings against interference with educational methodology as an invitation to abdicate our obligation to enforce the statutory provisions [of the Act].").

### 3. Mainstreaming and the Definition of an Appropriate Education

The parties have expressed some disagreement about what is the controlling legal standard for evaluating whether the School District has met the Act's requirements. Counsel for Andrew L. directs our attention to a section of the Act the Supreme Court has never directly interpreted, the section containing the procedural requirement that states mainstream children with disabilities to the maximum extent appropriate. 20 U.S.C. § 1412(5)(B); *see Daniel R.R.*, 874 F.2d at 1045; *Lachman v. Illinois State Board of Educ.*, 852 F.2d 290, 296 (7th Cir. 1988); *Board of Educ. of East Windsor Regional School District v. Diamond*, 808 F.2d 987, 992 (3d Cir.1986). Andrew L. argues that this section controls and that mainstreaming his program in reading under the November, 1992 IEP is not appropriate.

The School District directs our attention to a section of the Act the Supreme Court interpreted in the *Rowley* opinion, the section containing the requirement that states provide each individual child with disabilities a "free appropriate education." 20 U.S.C. § 1412(1); *Rowley*, 458 U.S. at 202–207, 102 S.Ct. at 3048–3051; *Illinois State Board of Educ.*, 41 F.3d at 1166; *Lachman*, 852 F.2d at 296. Under the *Rowley* criteria, the School District argues the November, 1992 IEP satisfies the requirements of a "free appropriate education." We believe that the School District has identified the proper controlling law.

The Supreme Court in *Rowley* outlined the substantive standards a school district must meet in order to satisfy its obligations under the IDEA of providing a free appropriate education. *See Rowley*, 458 U.S. at 206–07, 102 S.Ct. at 3050–51; *Lachman*, 852 F.2d at 293. Review of the school district's obligations is twofold:

First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Rowley*, 458 U.S. at 206–07, 102 S.Ct. at 3051. The Supreme Court reasoned, "once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States." *Id.* at 208, 102 S.Ct. at 3052. To answer the first question, we look to see if the procedural

requirements of the IDEA, including the mainstreaming requirement, have been met. *Lachman,* 852 F.2d at 294. To answer the second question, we ask if the IEP provides access to specialized instruction and related services which are individually designed to provide an educational benefit, or, put another way, designed to enable the child with disabilities "to achieve passing marks and advance from grade to grade." *Rowley,* 458 U.S. at 204, 102 S.Ct. at 3049–50; *see Blickle v. St. Charles Community Unit School District No. 303,* 1993 WL 286485, at \*8, 1993 U.S.Dist. Lexis 10396 at \*23 (N.D.Ill.1993) (holding district provided appropriate IEP where child was receiving B's and C's); *Chuhran v. Walled Lake Consolidated Schools,* 839 F.Supp. 465, 474 (E.D.Mich. 1993) (holding IDEA requirements met when student passed mainstream classes and was graduated).

In making these inquiries, federal courts operate under apparently conflicting directions as to their scope of review. Under 20 U.S.C. § 1412(5)(B), the IDEA gives us broad authority to review the first question of *where* a state places a disabled child (the "least restrictive environment" under the mainstreaming preference). *See, e.g., Rachel H.,* 14 F.3d at 1403–04. At the same time, *Rowley* has interpreted the IDEA to require us to defer to the states on the second question of *how* they educate a disabled child (a question of methodology). *See Lachman,* 852 F.2d at 296. While the *Rowley* Court did provide a substantive standard for deciding whether a child has received an appropriate educational program from the state once procedural requirements have been met, it declined to address the standard for reviewing the states' procedural compliance with the Congressional preference for mainstreaming. *Rowley,* 458 U.S. at 202–203, 102 S.Ct. at 3048–3049.

The parties' disagreement as to whether we operate under a broad or a narrow scope of review mirrors the conflicting policies to be found in the Act itself. Federal courts reviewing IDEA cases have recognized an essential tension between the requirement that schools provide individual programs to meet the needs of specific disabled children and Congress' preference that disabled children be mainstreamed into regular classes. *See Rachel H.,* 14 F.3d at 1403–04; *Oberti,* 995 F.2d at 1214; *Daniel R.R.,* 874 F.2d at 1048; *Lachman,* 852 F.2d at 294; *Roncker v. Walter,* 700 F.2d 1058, 1063 (6th Cir.1983). One commentator has observed of this tension, "Congress requires schools to treat children with disabilities differently [from] children without disabilities, underscoring their uniqueness, while on the other hand preferring that schools educate children with disabilities alongside non-disabled children, emphasizing their commonality with other children." Melvin, *supra,* at 643.

Where the mainstreaming elements of a dispute under the IDEA are minimal, the Seventh Circuit has resolved the tension in favor of characterizing the dispute as arising under educational methodology—a decision the *Rowley* Court requires us to leave to the states. *Lachman,* 852 F.2d at 296. In *Lachman,* the parents of a deaf child brought suit to enjoin the school district from placing him in a sign language education program apart from nondisabled peers. The parents believed he was best educated in regular classrooms with the assistance of a full-time cued speech instructor. *Id.* at 291. The school district wished to characterize the dispute as one involving methodology because under *Rowley* the sign language instruction satisfied the requirement that the individual educational program be "reasonably calculated to confer an educational benefit." On the other hand, the parents wished to characterize the dispute as one involving educational environment because, under section 1412(5)(B) of the IDEA the school was required to educate the child in a mainstreamed setting "to the maximum extent appropriate," i.e., in the least restrictive educational environment.

The *Lachman* court held for the district. They first reasoned, "Because the parties' disagreement as to the extent to which Benjamin is to be mainstreamed is inexorably intertwined with their disagreement as to the choice between the cued speech and total communication methodologies, we must first ascertain which of those issues, if any, predominates here." *Id.* at 294. The court

decided, "a determination of whether the IEP proposed for Benjamin provides for mainstreaming to the maximum extent appropriate can be made only within the context of the methodology employed to facilitate his education." *Id.* at 296. The parents' contention that their son could be fully mainstreamed rested squarely in their belief in a particular educational methodology, the cued speech technique. *Id.* The court further held "that the district court did not err when it framed its substantive analysis in a manner closely tracking the Rowley opinion, without expressly addressing the § 1412(5)(B) mainstreaming issue." *Id.*

*Lachman* guides this Court on the proper method for interweaving the mainstreaming requirement into our analysis of the appropriateness of Andrew L.'s November, 1992 IEP under the standards set forth in *Rowley.* As did the *Lachman* court, we first determine which aspect of the dispute predominates. *Id.* at 294.

■■■ The dispute between Andrew L.'s parents and the School District can be characterized either as one of placement or one of methodology. To evaluate the extent of the mainstreaming element in this dispute, we look to see how much difference there is between the two IEP's in the amount of time Andrew L. would spend in regular classes. Andrew L.'s parents believe that his placement in 225 minutes per week of direct special education services that would include reading is an appropriate education for him under the IDEA. They believe that the School District's proposed placement in 150 minutes of direct services in other instructional areas with thirty minutes of consultative services to augment his regular education reading class is not an appropriate education for him under the IDEA. The extent to which this dispute is about mainstreaming amounts to seventy-five minutes per week of instruction, or fifteen minutes per school day. Aside from that, the amount of time Andrew L. spends with his classmates in regular education classes is identical under both the April, 1992 IEP or the November, 1992 IEP.

To evaluate the extent of the methodological aspect of this dispute, we identify where the educational methods desired for Andrew L. by the opposing parties differ. Andrew L.'s parents believe that direct learning disabled instruction in both reading and written language are necessary to provide him an appropriate education because they believe his subtle processing weakness and slight attention deficit would prevent him from achieving at grade level in reading if his special education reading services were reduced. They contend that to maintain his successful performance, he requires the extra attention of a special education teacher in reading who can deploy multi-sensory and meta-cognitive educational strategies. The School District believes that direct learning disabled instruction in reading is unnecessary to provide him an appropriate education because his reading at grade level indicates he is now ready to attempt a smooth transition into a regular class. They contend that they can effectively provide the teaching strategies for reading desired by the parents in the regular education classroom. Further, regular education will benefit Andrew L. socially by preserving his self esteem before his peers.

We find that the methodological aspect of this dispute predominates. Only a fraction of Andrew L.'s school day is at issue in regard to the difference in time spent with non-disabled children. The gravamen of the dispute centers on the content and techniques of the accommodation of his processing and attention weaknesses. We may therefore frame our analysis based on the standards set out as the second question in the *Rowley* opinion—whether the IEP at issue was reasonably calculated to confer an educational benefit. *See Lachman*, 852 F.2d at 296.

### 4. Due Weight for the State Administrative Decisions

■■■ The School District has the burden of persuasion in challenging the state administrative appeals because it is the party challenging the outcome below. *Board of Educ. of Community Consolidated School District No. 21 v. Illinois State Board of Educ.*, 938 F.2d 712, 716 (7th Cir.1991). Be-

cause we do not review the outcome below *de novo,* but rather on a preponderance standard giving due weight to the administrative findings, we must scrutinize those findings to ascertain how much weight they deserve.

In giving due weight to the conclusions of the Level I and Level II hearing officers, we recognize that because of the agency officers' special expertise in education law, "a sound basis exists for giving deference to [their] decisions...." *Illinois State Board of Educ.,* 41 F.3d at 1167. Indeed, after independent review of the record, we accept their findings of fact. We cannot, however, accept their conclusions of law. We observe that neither one properly applied the *Rowley* standards to Andrew L.'s November, 1992 IEP.

The Level I and Level II hearing officers each issued an identical numbered set of conclusions of law. They are:

1. Procedural due process has been accorded all parties in this matter.

2. The school district is not bound to follow the parents' preferences in matters of educational philosophy and methodology.

3. The school district has failed to meet its burden to prove that circumstances warranted any modification of the April 23, 1992 IEP, as set forth in the proposed November 4, 1992 IEP.

4. The school district has failed to prove that the proposed November 2, 1992 IEP [sic] would confer an "educational benefit."

5. To fulfill its obligation to provide a free and appropriate public education to handicapped children, a school district must provide meaningful access to such special education and related services as it provides. *Board of Education v. Rowley,* [458 U.S. 176, at p. 191–92] 102 S.Ct 3034, at p. 3043.

(Level II Opinion at 7–8; Level I Opinion at 4–5).

 The third, fourth, and fifth numbered conclusions deserve no weight from this Court because they set forth erroneous legal standards. The third conclusion implies erroneously that the School District carries a burden under the IDEA to justify each change to an IEP. This is incorrectly

stated. Under *Rowley,* a local educational agency simply must show that each IEP is reasonably calculated to confer an educational benefit and to allow the student to progress adequately from grade to grade. *Rowley,* 458 U.S. at 204, 102 S.Ct. at 3049–50. The fourth conclusion of law erroneously states that the School District must show that the IEP *will* confer an educational benefit. Not only does this misstate the standard, but it also constitutes an impossible burden to meet. No school can guarantee that an IEP will prove successful. The federal regulations explicitly disclaim the notion that an IEP provides a guarantee of any sort. *See* 34 C.F.R. § 300.350. The fifth conclusion of law takes out of context dictum of the Supreme Court in *Rowley* that the IDEA was passed to require states to open its doors to handicapped children and provide education that is "meaningful." *See Rowley,* 458 U.S. at 192, 102 S.Ct. at 3043–44. In context, the relevant passage states, "But in seeking to provide such access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access *meaningful.*" *Id.* (emphasis added). The fifth conclusion therefore has little relevance to the present dispute as a statement of law. We hold that the conclusions of law made by the administrative hearing officers deserve no weight because they misapplied the legal standard governing review of an IEP. We now proceed to review the obligations of the School District in fashioning the November, 1992 IEP on a preponderance standard.

### 5. The November, 1992 IEP

 The November, 1992 proposed IEP satisfied the School District's obligations under the IDEA with respect to Andrew L. Each case under the IDEA is highly individualized and depends on the specific facts surrounding it. *Rachel H.,* 14 F.3d at 1402; *Daniel R.R.,* 874 F.2d at 1048; *Lachman,* 852 F.2d at 293. We are reluctant to take too much shelter under the holdings of other courts in interpreting the meaning of "reasonably calculated to confer an educational benefit" because of the varied factual milieus

and procedural postures in which those disputes have reached the federal courts. *See Rowley*, 458 U.S. at 202, 102 S.Ct. at 3048–49. "The Act requires participating States to educate a wide spectrum of handicapped children, from the marginally hearing-impaired to the profoundly retarded and palsied. It is clear that the benefits obtainable by children at one end of the spectrum will differ dramatically from those obtainable by children at the other end, with infinite variations in between." *Id.*

■ Andrew L. is a highly intelligent child who has a learning disability relating to processing sequential elements of information. We should be cautious about finding analogies between this case and other cases involving severely and permanently disabled children. *See, e.g., Illinois State Board of Educ.*, 41 F.3d at 1165 (autism, speech and language impairment); *Illinois State Board of Education*, 938 F.2d at 713 (disruptive and violent behavior disorder); *Lachman*, 852 F.2d at 291 (profound deafness); *MR v. Lincolnwood Board of Educ.*, 843 F.Supp. 1236, 1237 (N.D.Ill.1994) (disruptive emotional disorder causing bizarre conduct); *School District of Kettle Moraine v. Grover*, 755 F.Supp. 243, 243 (E.D.Wis.1990) (Downs syndrome).

With these caveats in mind, we find that the plan for Andrew L.'s fifth grade education contained strategies and methodologies reasonably calculated to accommodate his sequential processing and attention weaknesses. The November, 1992 IEP contained 150 minutes per week of learning disabled instruction in written language, sequencing, and organization, and thirty minutes per week of consultative services to monitor his regular education reading progress. The numerous accommodations made for Andrew L. to help him overcome his learning disability reflect a sufficient sensitivity to his needs and a sufficient methodological expertise to enable Andrew L. to advance from grade to grade. Under the November, 1992 IEP, the School District would have continued direct

services in written language, sequencing, and organizing; would have guaranteed interaction and consultation between his special education and regular education instructors over Andrew L.'s progress in reading; would have continued in the use of multi-sensory approaches, such as the use of tape recorders to record his assignments; and would have observed Andrew L. in case of any regression. Andrew L. was already in regular education for most of his classes; he had achieved high marks in his regular and special education courses; he was reading at grade level at the time of the modifications; and he scored in the normal range on several reading achievement tests.[1] The expert testimony Andrew L. has presented to show that he will more likely achieve at his potential with the help of special education placement in reading is unavailing. The Act sets minimum standards for the School District. If they have complied with those minimum standards, "the courts can require no more." *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051.

■ We are mindful that Andrew L.'s successful marks do not dispose of the inquiry. The IDEA does not contemplate that special education is like the minor leagues, where success will elevate a student into the major leagues of regular education. In the context of the accommodations made by the School District for his benefit, though, we believe that his academic success shows that the School District met its burden under the Act in the proposed November, 1992 IEP. *See Rowley*, 458 U.S. at 203 n. 25, 102 S.Ct. at 3049 n. 25. As the Supreme Court in *Rowley* stated in a similar context,

> We do not hold today that every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a "free appropriate public education." In this case, however, we find Amy's academic progress, when considered with the special services and professional consideration accorded by the

---

1. We congratulate Andrew and his parents on his excellent academic performance last year. We are sure that few seventh graders have been as successful as Andrew, earning a solid A in every final grade. The level of concern and dedication

that Andrew and his parents have consistently shown to his education is admirable. His efforts to overcome his particular challenges and to discipline his mind will continue to open doors as he makes his way in the world.

Furnace Woods school administrators, to be dispositive.

*Id.* The November, 1992 IEP was reasonably calculated to confer an educational benefit and help Andrew L. advance from grade to grade. *See Rowley,* 458 U.S. at 209, 102 S.Ct. at 3052.

### CONCLUSION

For the reasons stated above, we grant the School District's motion for summary judgment and deny Andrew L.'s motion for summary judgment. The November, 1992 IEP would have satisfied the School District's obligations under the IDEA.