**C & F PACKING CO., INC., Plaintiff,**

v.

**IBP, INC. and Pizza Hut, Inc., Defendants.**

**No. 93 C 1601.**

United States District Court, N.D. Illinois, Eastern Division.

Sept. 26, 1995.

Cir.1993). This Court is bound to follow the    holdings of our own court of appeals.

Raymond P. Niro, William L. Nero, Samuel L. Alberstadt, John C. Janka, Niro, Scavone, Haller & Niro, Chicago, IL, for Plaintiff.

Alan L. Unikel, Denise M. Serewicz, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, Roger Pascal, Patricia J. Thompson, Chicago, IL, for Defendants.

ANN CLAIRE WILLIAMS, District Judge.

The court adopts Magistrate Ashman's Report and Recommendation in full. The court has carefully considered defendant's objections and finds no reason to disturb Judge Ashman's Report and Recommendation. Therefore, plaintiff's motion to strike defendants' reply and defendants' response to C & F's 12N Statement is denied, defendants' motion for summary judgment on infringement is denied, and defendants' motion for summary judgment as to inequitable conduct is denied.

## REPORT AND RECOMMENDATION

ASHMAN, United States Magistrate Judge.

This case is presently before the Court on Defendants', IBP, Inc. ("IBP") and Pizza Hut, Inc. ("Pizza Hut"), motion for summary judgment and Plaintiff's, C & F Packing Co., Inc. ("C & F"), motion to strike Defendants' reply briefs and response to C & F's 12(N) Statement. C & F filed its original complaint on March 17, 1993 against IBP, and subsequently filed a nine-count second amended complaint on May 14, 1993 against IBP and Pizza Hut seeking injunctive relief in addition to compensatory and punitive damages. At issue in this motion is Count V wherein C & F alleges that IBP infringed on C & F's Patent No. 4,800,094 entitled, "METHOD FOR PROCESSING A COOKED FOOD PRODUCT" (" '094 patent"). Specifically, C & F alleges that IBP made and sold meat products in the United States using a process that practices the inventions claimed in the '094 patent. Additionally, in Count V, C & F alleges that Pizza Hut induced and aided this infringement.[1] The pending motions were fully briefed on November 30, 1994 and December 8, 1994, respectively; this case was reassigned to this Court on February 17, 1995 and oral argument took place on May 12, 1995.

## I. FACTS

The relevant and undisputed facts follow:[2]

C & F is an Illinois corporation with principal place of business in Elk Grove Village,

---

1. The only remaining count against Pizza Hut is Count V as Judge Williams dismissed Counts I–IV and VIII by Memorandum Opinion and Order dated January 26, 1994.

2. C & F has filed a Motion to Strike Defendants' Response to C & F's 12(N) Statement asserting that "that paper is not authorized by this Court's Local Rules, which provide only for a 12(m) statement from the moving party and a 12(n) statement from C & F, the opposing party." (C & F Motion to Strike, p. 4.) C & F's motion is denied. Even the most cursory reading of Local Rule 12 demonstrates the total lack of merit of C & F's motion. Local Rule 12(M) expressly directs:

   If additional material facts are submitted by the opposing party pursuant to section N of this rule, *the moving party may submit a concise reply* in the form prescribed in section N for a response. All material facts set forth in the statement filed pursuant to section N(3)(b) will be deemed admitted unless controverted by the statement of the moving party. (Emphasis added).

(Local Rule 12(M)(3)(b)). Therefore, not only does IBP have the right to respond to any additional facts presented by C & F in the 12(N) Statement, it *must* do so or else those additional facts will be admitted. C & F's 12(N) statement contained many "additional facts" to which Defendants responded—such response is fully within the contemplation of Local Rule 12.

The Court further notes that, pursuant to Local Rule 12(M) and 12(N), the parties have submitted a statement of undisputed facts, a response and a reply to additional facts. However, instead of the "short numbered paragraphs," "concise repl[ies]" or "concise response[s]" mandated by Local Rule 12, both parties have favored the Court with often lengthy paragraphs filled with legal conclusions and arguments. Consequently, of IBP's 94 "material facts to which there is no genuine issue," fewer than 10 were admitted by C & F and of C & F's 104 "additional facts," fewer than 20 were admitted by IBP to some extent. The result is that, instead of a clear set of undisputed facts, the Court has been forced to perform a laborious winnowing to discern what, in fact, the undisputed facts actually are.

Illinois which makes and sells a variety of meat products, including Italian sausage. In the early 1970's, C & F began to supply Pizza Hut with uncooked Italian sausage for Pizza Hut restaurants in the Chicago area. Pizza Hut is a Delaware corporation with corporate headquarters in Wichita, Kansas which operates fast food franchises throughout the United States. C & F eventually became an officially-approved national supplier for Pizza Hut.

C & F is assignee of the '094 patent, which was issued on January 24, 1989.[3] The '094 patent is directed to an "apparatus and method for processing a cooked food product and producing a plurality of cooked food product portions." As the '094 patent specification discusses, there are several patented devices relating to the extrusion and formation of food product portions from raw or frozen food mixtures. These processes and devices have been found to be slow and expensive. Further, the '094 patent specification identifies a recognized market for precooked food products of predetermined size which are readily usable in preparing specific food products (i.e., serving portions of meat or cheese for pizza toppings).

The '094 patent states that the "present invention has reduced or eliminated the problems associated with devices and processes heretofore known." ('094 patent, Col. 1, lns. 67–68). This invention, as described in the specification, details a step by step method for producing a cooked food product which, when processed through an extrusion apparatus, can be divided into a plurality of cooked food portions having a predetermined weight.

According to the specification's description of the invention, an emulsion is first formed from a combination of ingredients (i.e., food product, seasonings and liquid). This emulsion is then put into a mold and subsequently heated for the specific time at the specific temperature required to cook the food product. When cooked, the food product is cooled to a temperature between 35°–40° F. to form a cooked food product loaf. This loaf is then placed in an extrusion apparatus wherein the loaf is forced at selectively variable pressures through an extrusion plate and subsequently extruded to form a plurality of elongated continuous lengths of cooked food product. Immediately on the other side of the extrusion plate these lengths of cooked food product are cut by a reciprocating blade whose rate of reciprocation, when coupled with the rate of extrusion, determines the thickness of cooked food product portions. These portions are then finally frozen for shipment. The result is a "unique, cost-effective, time saving method and apparatus" for processing a plurality of different shapes and sizes of cooked food products with very close weight tolerances which have the appearance of being hand formed. ('094 patent, Col. 1, lns. 59–64).

The patent specification presents several embodiments of the invention which provide for the formulation of cooked food product portions having a variety of shapes, "including, but not limited to, randomly shaped portions, uniformly shaped portions and the like; and which may take on a hand formed appearance." ('094 patent, Col. 8, lns. 35–41). The specification further provides for variable adjustment of certain operational parameters to vary the thickness and weight of these portions. The specification expressly asserts that "no limitation with respect to the specific apparatus illustrated herein is intended or should be inferred." ('094 patent, Col. 8, lns. 48–51).

The '094 patent specification concludes with some 25 claims of which five are classified as independent claims relating to the production of precooked food products: Claim Nos. 1, 7, 11, 20 and 25. Each of these claims sets forth a "method" for producing a precooked food product as above described and details an extrusion process wherein the

These 12(M) and 12(N) submissions, plus C & F's Motion to Strike Defendants' Response discussed above, exhibit at best a misunderstanding of, and at worst a patent disregard for, the clear language of Local Rule 12. The Court exhorts counsel for the parties to read the Local Rules and spare the courts of the Northern District of Illinois future wastage of time.

3. C & F filed its application for the '94 Patent on September 15, 1986. The 1986 application was based on an earlier patent application filed on August 6, 1985.

food product is "extruded" or "forced" or "compressed" through an "extrusion plate" or "plurality of restrictive orifices" to form "a plurality of irregularly shaped continuous lengths of [cooked product or cooked emulsion]" or "lengths of irregularly shaped precooked sausage product". The final step in each claim is the "continuous," or "simultaneous," "dividing," or "cutting," of "said lengths" into "randomly shaped irregular" "portions" or "pieces." [4] (*See* '094 patent, Cols. 8–12).

C & F produced precooked sausage pizza toppings and supplied them to Pizza Hut. However, in 1993 Pizza Hut terminated C & F's contract as a supplier.

IBP is a Delaware corporation with corporate headquarters in Dakota City, Nebraska which operated a service center in Illinois and supplies meat products to a variety of customers throughout Illinois. IBP supplies meat products to Pizza Hut including precooked sausage pizza toppings. From November 1990 to January 26, 1994, IBP engaged in commercial production of precooked Italian sausage pizza topping. This process included the creation of "chubbs" comprised of raw meat and other ingredients stuffed into a sausage casing. The chubbs were then cooked, chilled, removed from the casing and halved. Subsequently, the chubbs were inserted into an extrusion apparatus wherein a hydraulic ram forced the chubbs through a dicing plate comprised of six columns and five rows of orifices shaped like equilateral triangles with rounded edges. The chubbs were thereby extruded into thirty separate continuous lengths of precooked sausage which were immediately cut by one wing of a three wing blade into individual Italian sausage pizza topping pieces. For the extrusion process, IBP used a Holac dicer with specially made extrusion plates.

## II. *THE CLAIMS AT ISSUE*

The claims at issue in this suit are Claims 1, 7 and 20–22. (C & F Response, p. 16). Claim 1 is the first independent claim contained in the '094 patent and reads as follows:

A method for forming, cooking and processing a meat or poultry containing food product comprising the steps of:

reducing the size of the food product by grinding, chopping, milling or comminuting said product to create a formable mass;

forming a defined product loaf from said formable mass;

cooking said product loaf through the application of heat;

positioning the cooked product loaf in an extrusion location on one side of an extrusion plate;

compressing at least a portion of said cooked product loaf to thereby extrude the cooked product loaf through said extrusion plate to form a plurality of irregularly shaped continuous lengths of cooked product; and

dividing said lengths of cooked product into a plurality of cooked product portions which have a handformed, randomly shaped irregular appearance and have a predetermined weight.

Claim 7 is the second independent claim contained in the '094 patent and provides as follows:

A method for producing a plurality of pre-cooked meat product portions comprising the steps of:

forming a meat-containing emulsion from a meat product [sic]

placing said emulsion into a container having a defined shape;

cooking said emulsion in the container to thereby produce a cooked product loaf;

positioning said cooked product loaf in an extrusion location on one side of an extrusion plate;

maintaining force on said cooked product loaf such that said cooked product loaf is compressed and moved toward said extrusion plate;

extruding said cooked product loaf through said extrusion plate forming a plurality of elongated irregularly shaped continuous lengths of cooked product; and

---

**4.** Only Claim 1 directs that the portions should have a 'handformed' appearance.

continuously cutting said elongated continuous lengths of cooked product on a second side of said extrusion plate thereby producing a plurality of randomly shaped irregular cooked product portions which have a predetermined weight.

Claim 20 is the fourth independent claim contained in the '094 patent and states as follows:

A method for making a precooked sausage product suitable for use as a pizza topping comprising the steps of:

preparing an emulsion containing at least meat or poultry;

mixing a seasoning into said emulsion;

stuffing said emulsion into a sausage casing at a pressure sufficient to fill said casing and form a loaf of predetermined shape;

applying heat to the loaf for a time at a temperature sufficient to cook it;

cooling the cooked loaf;

removing the sausage casing from the cooked loaf;

forcing the cooked loaf by application of compressive forces through a plurality of restrictive orifices to form lengths of irregularly shaped precooked sausage product; and

simultaneously cutting said lengths of extruded precooked sausage product to form a plurality of randomly shaped irregular precooked sausage portions which have a predetermined weight.

Claims 21 and 22 are dependent claims which incorporate all of the limitations of Claim 20 and provide as follows: [5]

21. The method of claim 20 wherein said orifices are formed in an extrusion plate and said cutting is carried out by a blade that simultaneously cuts said extruded lengths of precooked sausage product.

22. The method of claim 21 wherein the cooked loaf is cooled to temperatures of

about 30° F. to 40° F. before being forcing through the plurality of restrictive orifices.

## III. DISCUSSION

### A. C & F'S MOTION TO STRIKE DEFENDANTS' REPLY

C & F moves to strike Defendants' Reply memorandum, or, in the alternative, it seeks leave to file a Sur–Reply. C & F argues that Defendants' Reply is improper because raises new issues, makes new arguments, and presents new evidence and caselaw not previously introduced in the opening memoranda. This motion was accompanied by C & F's Motion to Strike Defendants' Response to the 12(N) statement. As previously discussed in Footnote 1, C & F's later motion should be denied.

C & F's Motion to Strike Defendants' Reply should also denied. The three issues classified as "new" were actually raised by C & F in its Response. Defendants were responding to C & F's arguments and supporting them with evidence and caselaw, an action for which they have every right. C & F's motion appears to be an attempt to get in the "last word" with a sur-reply. The Court feels that, with over one hundred pages of briefs, nearly one hundred pages of "undisputed facts," six inches of supplemental materials between the parties, and 1½ hours of oral argument, it is only appropriate that, mercifully, the "last word" on Defendants' Motion for Summary Judgment come from the Bench itself.

### B. DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

#### 1. Standard for Summary Judgment

Summary judgment is proper only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judg-

---

5. The Court notes that while C & F alleges that IBP infringed on the '094 patent by making and selling "meat products" (*see* Second Amended Complaint, ¶ 67), the only product referred to throughout this litigation has been precooked sausage pizza topping. Furthermore, the Court

notes that only independent Claims 20 and 25 detail a "method for making a precooked sausage product suitable for use as a pizza topping." ('094 patent, Col. 10, lns. 50–52, Col. 12, lns. 1–3).

ment as a matter of law." FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In determining whether summary judgment is appropriate, we must view the evidence, and draw all reasonable inferences from the evidence, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Kennedy v. United States,* 965 F.2d 413, 417 (7th Cir.1992).

## 2. *Infringement*

■ Although infringement is a question of fact, summary judgment remains appropriate in a patent case where no genuine issue of material fact is present and the movant is entitled to judgment as a matter of law. *Townsend Engineering Co. v. HiTec Co., Ltd.,* 829 F.2d 1086, 1089 (Fed.Cir.1987). However, summary judgment on the issue of infringement must be approached with great care. *Palumbo v. Don–Joy Co.,* 762 F.2d 969, 974 (Fed.Cir.1985).

In Count V of its complaint, C & F alleges that both IBP and Pizza Hut violated 35 U.S.C. § 271(a) and (b) when IBP produced precooked sausage pizza topping using a process that practices the inventions claimed in the '094 patent.[6] IBP and Pizza Hut contend that the undisputed facts show no genuine issue of material fact and that they are entitled to summary judgment. Defendants argue that C & F cannot prove by a preponderance of the evidence that IBP's process of manufacturing precooked sausage pizza topping either literally infringed or was substantially equivalent to the process covered by the '094 patent.

■ To establish infringement of a patent, a plaintiff must show by a preponderance of the evidence that every limitation set forth in the a claim is found in the accused product or process exactly or by a substantial equivalent. *Johnston v. IVAC Corp.,* 885 F.2d 1574, 1577 (Fed.Cir.1989). "Infringe-

ment, literal or by equivalence, is determined by comparing the accused product not with a preferred embodiment described in the specification, or with a commercialized embodiment of the patentee, but with the properly and previously construed claims in suit." *SRI Intern. v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1121 (Fed.Cir.1985) (*en banc* ), *citing ACS Hospital Systems, Inc. v. Montefiore Hospital,* 732 F.2d 1572, 1578 (Fed.Cir.1984).

■ Therefore, patent infringement analysis requires a two-step inquiry: a threshold question of claim interpretation followed by a determination of whether the properly interpreted claim encompasses the accused product or process. *Texas Instruments Inc. v. United States Intern. Trade Com'n,* 988 F.2d 1165, 1171 (Fed.Cir.1993). The first is a question of law while the second is a question of fact. *Southwall Technologies, Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1575 (Fed.Cir. 1995), *citing Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 977 (Fed.Cir.1995) (*en banc* ) ("Notwithstanding the apparent inconsistencies in our opinions, the Supreme Court has repeatedly held that the construction of a patent claim is a matter of law exclusively for the court.").

### a. *Claim Interpretation*

■ A patent is a government grant of rights which allows the patentee to exclude others from making, using, or selling the invention as claimed. 35 U.S.C. § 154. Claims are the metes and bounds of a patent and must be interpreted in light of the claim language and specification. *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,* 868 F.2d 1251 (Fed.Cir.1989). There are two types of claims in a patent: independent claims and dependent claims. An independent claim stands on its own and does not refer to any other claim in the patent; thus, it must be read separately from the other claims when determining its scope. A de-

---

6. Section 271 provides in pertinent part:
  (a) Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

  (b) Whoever actively induces infringement of a patent shall be liable as an infringer. (35 U.S.C. § 271(a) and (b)).

pendent claim includes a reference to at least one other claim in the patent and incorporates all of the elements of the claim to which it refers. For example, in this case the '094 patent claims in issue include independent Claims 1, 7 and 20 and dependent Claims 21 and 22. Claims 21 and 22 refer to Claim 20 and include an additional element or limitation, and these claims must be interpreted to encompass each element of Claim 20 as well as their own additional elements. However, the additional limitations of a dependent claim must not be read or implied into an independent claim if said independent claim does not contain the same limitation. *See D.M.I., Inc. v. Deere & Co.,* 755 F.2d 1570 (Fed.Cir.1985). In other words, "the dependent claim tail cannot wag the independent claim dog." *North Am. Vaccine, Inc. v. American Cyanamid Co.,* 7 F.3d 1571, 1577 (Fed.Cir.1993).

■ In construing a claim the court essentially defines the federal legal rights created by the patent document. *Markman,* 52 F.3d at 978. Courts must neither narrow nor broaden the scope of a claim to give the patentee something different than what he has set forth. *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1433 (Fed.Cir.), *cert. denied,* 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988). Claim interpretation requires consideration of the claims, the specification, and the prosecution history as well as testimony from experts or those skilled in the art as to their interpretations. *Markman,* 52 F.3d at 979.

■ A patent's specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention. *Markman,* 52 F.3d at 979. The specification must conclude with "one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. Claims are, therefore, part of the specification and must be read with that in mind. Ultimately, however, the claim measures the invention and the fundamental difference between a specification and a claim is that "claims are infringed, not specifications." *SRI Intern.,* 775 F.2d at 1121. Consequently, not everything

in a specification must be read into a claim, and the court cannot read into a claim a limitation that appears in the specification, but not in the claim. *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d 1559, 1566 (Fed.Cir.1992); *SRI Intern.,* 775 F.2d at 1121. In other words, simply because "claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims." *Raytheon Co. v. Roper Corp.,* 724 F.2d 951, 957 (Fed. Cir.1983). In addition, references to a preferred embodiment, such as those in the specifications or drawings, are not claim limitations. *Laitram Corp. v. Cambridge Wire Cloth Co.,* 863 F.2d 855, 865 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1068, 109 S.Ct. 2069, 104 L.Ed.2d 634 (1989).

■ Yet, for claim interpretation purposes, the description in the specification can act as a dictionary explaining the invention and defining terms critical to the claims. *Markman,* 52 F.3d at 979. For this reason, the specification has generally been considered "the primary basis for construing the claims" of a patent. *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 452 (Fed.Cir.1985). An oft-repeated concept in these cases is that the "patentee is free to be his own lexicographer." *Markman,* 52 F.3d at 980, *citing Autogiro Co. of America v. United States,* 384 F.2d 391, 397, 181 Ct.Cl. 55 (1967). However, any special definitions must be clearly defined in the specification and words of the claim should be given their ordinary and accustomed meaning, unless it appears that the inventor used them differently. *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1579 (Fed.Cir.1988). Ultimately, the *Markman* court held, that, "in a case tried to a jury, the court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim." *Markman,* 52 F.3d at 979.

■ Another source relevant to claim construction is the prosecution history (also known as the file wrapper). The prosecution history contains the entire record of proceedings in the Patent and Trademark Office ("PTO") including express representations

made by or on behalf of the applicant to induce the granting of the patent. Often among those representations are amendments and arguments made to convince the patent officer that the claimed invention complies with the statutory requirements of novelty, utility and nonobviousness. The prosecution history, therefore, can provide a record of the applicant's disclaimed or disavowed interpretations which can be excluded by the court in any subsequent claim interpretation. *See Standard Oil Co.,* 774 F.2d at 452. However, just as with the specification, the prosecution history should be used to understand the meaning of the claim language, but cannot alter the limitations contained in the claims. *Markman,* 52 F.3d at 980.

■ Extrinsic evidence provides a final source of information helpful for claim interpretation. Extrinsic evidence encompasses all material external to the patent and prosecution history, including expert testimony. Such evidence cannot vary or contradict the terms of the claims but can help to explain scientific principles, the meanings of technical terms and terms of art which may appear in the patent or prosecution history. In other words, while expert testimony can provide evidence as to the meaning of claim language from which the Court can then determine claim construction, experts cannot provide testimony as to the actual construction of the claim itself. *See Markman,* 52 F.3d at 980, 981.

The claims at issue in this case are independent Claims 1, 7 and 20 and dependent Claims 21 and 22. The parties agree that the critical parts of each independent claim are the final two steps, simply known as the "extrusion step" and the "division step." The parties further agree that the critical elements for this case are essentially the same in that each claim requires that the food product be extruded through an extrusion plate to form a plurality of irregularly shaped lengths and further that these irregu-

larly shaped lengths be divided into a plurality of randomly shaped irregular portions. There is no dispute that "irregularly shaped" and "randomly shaped" must be accorded their ordinary and customary meanings of "not uniform" and "lacking perfect symmetry or form." (*see* IBP Memorandum, pp. 12–17, Pizza Hut Memorandum, p. 10, and C & F Response, p. 7).[7]

However, the parties differ as to how these terms affect the ultimate construction of each claim. C & F contends that these claims should be read as teaching a method of processing cooked food products into random, irregular or nonuniformly shaped portions with a predetermined weight. On the other hand, Defendants urge an interpretation which involves the same method but constructs the claims as utilizing an extrusion plate with irregularly shaped apertures.

■ In light of the pertinent evidence, the specification, the prosecution history and extrinsic evidence, this Court finds that the methods of processing cooked food products expressed in independent Claims 1, 7 and 20 teach methods of producing nonuniform portions which are not limited by the type of extrusion plate used in the extrusion step.

Defendants suggest, based on their analysis of the specification and prosecution history, that each of the '094 claims contain the additional limitation that the extrusion plate must have a plurality of randomly shaped apertures. Defendants conclude that since the critical limitation is 'irregularly shaped lengths' and 'randomly shaped portions,' there must be a limitation on the type of extrusion plate. First, Defendants cite language in the specification which states that "an extrusion plate with a plurality of randomly shaped apertures will extrude randomly shaped lengths of food product." ('094 patent, Col. 2, lns. 20–25). Defendants further emphasize distinctions highlighted in the drawings contained in the specification. Therein the specification notes the differ-

7. This usage is consistent with the definitions contained in Webster's II New Riverside University Dictionary (1994) ("Webster's II") wherein 'irregular' is defined as "not uniform, straight or symmetric." Webster's II at p. 645. 'Random' is defined as "having no specific pattern, purpose, organization or structure." Webster's II 973. Finally, 'uniform' is defined as "1.a. Always the same; b. being without variation or fluctuation; 2. being the same as another or others; 3. consistent in appearance." Webster's II at p. 1261.

ences between an extrusion plate with a plurality of randomly shaped apertures ('094 patent, FIG. 10), whose use is desirable if food portions are to take on a hand formed appearance ('094 patent, FIG. 9), and an extrusion plate with uniform apertures ('094 patent, FIG. 12), which produces food portions (FIG. 11) more uniform in shape than that of FIG. 9.

Second, Defendants rely on parts of the prosecution history in support of its claim construction. Specifically, Defendants cite the numerous amendments required by the Examiner which have the effect of narrowing the claims to 'irregularly shaped lengths' and 'randomly shaped irregular portions.' Said amendments were necessary to avoid prior art, especially the Grant patent (for a butter-cutting machine) and the Greenspan patent (for cooking meatloaf). Defendants contend that the specification language and the prosecution history mandate a finding that the '094 patent claims include a limitation that the extrusion plate have randomly shaped apertures.

This Court rejects Defendants' argument and interpretation. First, Defendants urge the Court to read into the claims limitations found only in the specification. Nowhere in Claims 1, 7 or 20 are there any limitations on the type of extrusion plate; the only limitations concern the lengths and the final portions. A full reading of the '094 patent reveals that several factors impact on the food product: the cooked nature of the product, the temperature of the loaf when extruded, the rate of extrusion, the rate of division and the type of extrusion plate. The specification and drawings clearly enumerate several embodiments of the extrusion plate (*see* '094 patent, FIGS. 10 and 12). However, such embodiments cannot be read as limitations on the claim. *See Laitram Corp.*, 863 F.2d at 865. Second, while the prosecution history documents amendments made to the application prior to approval of the '094 patent, these amendments concern the food product not the apparatus used. Nothing in the prosecution history helps to define the type of extrusion plate.

Therefore, independent Claims 1, 7 and 20 should be interpreted as describing a method of processing precooked food products into irregularly shaped lengths which are then divided into randomly shaped portions of predetermined weight. Additionally, Claim 1 requires the food portions to have a hand formed appearance. These claims should not be construed as limiting the type of extrusion plate.

Dependent Claims 21 and 22 refer only to Claim 20 and contain specific self-explanatory limitations. Specifically, Claim 21 directs extrusion through an extrusion plate and "simultaneous" cutting of the lengths; and Claim 22 requires that the food product loaf be cooled to 30°–40° F. before extrusion. As no party argued for an alternate interpretation, these claims must be accorded their ordinary and customary meanings.

Having thus construed the claims in issue without reference to accused device or product, these claims are then applied to the accused device or product to determine infringement. *SRI Intern.*, 775 F.2d at 1119. To establish infringement, a patentee must prove by a preponderance of the evidence either that every limitation set forth in the claim is found in the accused product or process exactly or by a substantial equivalent. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed.Cir.1991).

#### b. *Literal Infringement*

■■■■■ Literal infringement requires that the accused device embody every element of the claim. *Townsend Engineering*, 829 F.2d at 1090. Where a claim does not "read on" an accused device exactly, there can be no literal infringement. *Johnston*, 885 F.2d at 1580. All elements of the claim are material and essential, and must be considered, to determine whether a patent has been literally infringed. *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1533 (Fed.Cir.1987).

Defendants contend that they are entitled to summary judgment on the grounds that IBP did not infringe upon the '094 patent because it neither produced "lengths of irregularly shaped precooked sausage product" nor did it cut extruded lengths "to form a plurality of randomly shaped irregular precooked sausage portions." C & F counters

with testimony that supports its contention that IBP's product is in fact irregular in length and random in shape.

■■■ There appears to be a genuine issue of material fact regarding the classification of IBP's precooked sausage product. On one hand, C & F has expert testimony that the IBP's process produced random irregularly shaped portions. (*See* Ingegno Decl., Severini Decl. and Clark Decl.). On the other, the Defendants have testimony that the portions produced were not random or irregular. (Leising Dep., Layhee Dep.). Resolution of the literal infringement issue requires weighing this testimony which is improper on a motion for summary judgment. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511 ("at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"). As no undisputed conclusions can be reached from the evidence regarding IBP's product, there is a genuine issue of fact whether or not IBP literally infringed on the claims of the '094 patent.[8]

### c. *The Doctrine of Equivalents*

■■■ Under the doctrine of equivalents, an accused product which does not literally infringe a claim may nevertheless infringe "if it performs substantially the same function in substantially the same way to obtain the same result." *Southwall Technologies,* 54 F.3d at 1579, *citing Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). For a process to work in "substantially the same way" all of the limitations of the claim must be satisfied at least equivalently. *Becton Dickinson and Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 798 (Fed.Cir.1990). The doctrine of equivalents is limited in that it will not extend to cover an accused device in prior art or to allow a patentee to recapture through equivalence that coverage given

up during prosecution. *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931 (Fed. Cir.1987), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426, *cert. denied,* 485 U.S. 1009, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988).

Defendants argue, in the alternative, that:

1. prosecution history estoppel precludes C & F from invoking the doctrine of equivalents; and

2. even if prosecution history estoppel is not appropriate, IBP's process and product does not infringe even under the doctrine of equivalents.

Prosecution history estoppel applies as a limitation on the range of equivalents if, after the claims have been properly interpreted, no literal infringement has been found. *Southwall Technologies,* 54 F.3d at 1578. Courts have consistently held that the issue of prosecution history estoppel is a question of law; therefore, it will be addressed first. *Hoganas AB v. Dresser Industries, Inc.,* 9 F.3d 948, 952 (Fed.Cir.1993).

### 1) Prosecution History Estoppel

■■■ Under the doctrine of prosecution history estoppel, a patentee may not "obtain, through the doctrine of equivalents, coverage of subject matter that was relinquished during prosecution to procure issuance of the patent." *Hoganas,* 9 F.3d at 952. "The legal standard for determining what subject matter was relinquished is an objective one, measured from the vantage point of what a competitor was reasonably entitled to conclude, from the prosecution history, that the applicant gave up to procure issuance of the patent." *Hoganas,* 9 F.3d at 952.

■■■ Defendants suggest that, as a competitor, IBP was "reasonably entitled to conclude" that C & F's method requires the use of an extrusion plate with randomly shaped apertures and did not include an extrusion plate with uniform apertures. Specifically,

---

**8.** Both sides spend an inordinate amount of time alleging and fending off allegations that IBP engaged in a plan to copy C & F's process. This evidence and argument, while undoubtedly critical regarding other counts and regarding the issue of attorney's fees, are not helpful or persuasive for this infringement count—the issue at hand is not whether the defendants set out to infringe, the issue is whether they in fact infringed—just as merely attempting or desiring to infringe does not constitute infringement, so, too, unconscious or inadvertent infringement is still infringement.

Defendants argue that the prosecution history shows that the applicants gave up any claims to extrusion plates with uniform apertures given the types of amendments and statements made to get the patent approved. However, as noted in the claim interpretation section, most of these amendments and statements were made in an effort to differentiate this invention from prior art like the Grant patent, the Greenspan patent and the Holac dicer. This Court certainly finds that the product lengths and portions were expressly limited to "irregularly shaped" and "randomly shaped" but there is no express or implied disavowal of the use of an extrusion plate with uniform apertures. As discussed above in the claim interpretation section, this Court finds that the '094 claims are not limited by the type of extrusion plate used. C & F's method involves a number of factors, *i.e.*, temperature of the cooked food loaf, amount of force of extrusion, speed of the cutting blade, which must be considered in addition to the type of extrusion plate. The critical limitations in the '094 patent for purposes of this case are the requirement that the extruded lengths be irregular and the requirement that these lengths be divided into randomly shaped irregular pieces.

This Court finds nothing in the prosecution history as provided which supports a finding that C & F relinquished any claims based solely on the type of extrusion plate. Therefore, Defendants' arguments for prosecution history estoppel are not well-taken.

### 2) Applying the Doctrine of Equivalents

Defendants argue that the undisputed facts reveal that IBP's process and product did not practice the critical limitations of the '094 patent:

a) extruding a cooked food product into irregularly shaped lengths, and

b) dividing said lengths into randomly shaped irregular pieces.

Specifically, Defendants assert that IBP's process could not have worked in "substantially the same way" because IBP used a Holac dicer, which was a commercially available product expressly distinguished as prior art in the '094 patent, fitted with a special extrusion plate with regularly shaped apertures. Defendants further argue that IBP's process did not achieve substantially the same results as the '094 claims in that IBP did not produce the necessary irregularly shaped lengths of extruded food product nor did it divide such lengths into the necessary randomly shaped irregular pieces.

C & F counters that the "uncontroverted statistical evidence still demonstrate infringement" regardless of what equipment IBP used because IBP's produced the same result: a product with a random, irregular shape.

Considering all of the testimony in the light most favorable to C & F, this Court finds that genuine issues of material fact exist which preclude summary judgment. Specifically, both Defendants and C & F have provided compelling testimony in the form of affidavits, depositions and declarations which support their divergent analyses of IBP's product. Determination of infringement in this case, therefore, requires a weighing of this testimony to determine whether or not IBP's precooked sausage product was extruded into irregular lengths and subsequently divided into randomly shaped irregular pieces.

For these reasons, Defendants' motion for summary judgment on the issue of infringement should be denied.

### 3. INEQUITABLE CONDUCT

Alternatively, Defendants seek summary judgment on the theory that C & F allegedly engaged in inequitable conduct during the prosecution of the '094 patent. It is well settled that inequitable conduct renders all claims of the issued patent unenforceable. *Hewlett–Packard Co. v. Bausch & Lomb, Inc.*, 882 F.2d 1556, 1563 (Fed.Cir.1989), *citing Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 877 (Fed.Cir. 1988). While case precedent urges caution when granting summary judgment regarding a defense of inequitable conduct, summary judgment is nonetheless appropriate if the proper criteria are satisfied. *Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.*, 984 F.2d 1182, 1190 (Fed.Cir.1993). However, a summary judgment in these cases "ought to be, and can properly be, rare

748

indeed." *Burlington Industries, Inc. v. Dayco Corp.,* 849 F.2d 1418, 1422 (Fed.Cir.1988).

■ Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive. *Molins PLC v. Textron, Inc.,* 48 F.3d 1172 (Fed.Cir. 1995).[9] Under PTO rules, this duty to disclose and of good faith and candor rests with those substantively involved in the prosecution of the patent application, typically the patent applicants and their attorneys. 37 C.F.R. § 1.56(a) (1988).

■ Generally, a patent is presumed valid and enforceable and such presumption may only be overcome if there is clear and convincing evidence establishing invalidity. *ACS Hospital Systems, Inc.,* 732 F.2d at 1574; *Jones v. Hardy,* 727 F.2d 1524, 1528 (Fed.Cir.1984). Therefore, the party who alleges inequitable conduct arising from a failure to disclose prior art must offer clear and convincing proof of the materiality of the prior art, knowledge chargeable to the applicant of that prior art and its materiality, and the applicant's failure to disclose the prior art, coupled with an intent to mislead the PTO. *Molins,* 48 F.3d at 1178, *citing FMC Corp. v. Manitowoc Co., Inc.,* 835 F.2d 1411, 1415 (Fed.Cir.1987). Therefore, there are two threshold issues: materiality and intent. Once the findings of materiality and intent are established, the court must then make an equitable judgment, in light of all the circumstances, whether the applicant's conduct is so culpable that the patent ought not to be enforced. *Molins,* 48 F.3d at 1178.

Defendants contend that the '094 patent applicants made numerous misrepresentations in the 31 material references presented in the Information Disclosure Statement ("IDS") provided to the PTO on August 3, 1989. Specifically, Defendants allege that the applicants made material misrepresentations relating to four references: 1) an illustrated Holac dicer brochure ("Holac Brochure"); 2) a letter discussing the Holac

dicer ("Kierzl Letter") with attached materials ("Reinert Brochure"); 3) an advertisement for the Holac dicer from a trade magazine ("National Provisioner Ad") (hereinafter these documents will be referred to collectively as the Holac Documents); and 4) a prior art patent ("Van Werven patent").

C & F responds that the applicants did not misrepresent the relevance of either the Holac Documents or the Van Werven patent, and, in the alternative, that such references were either not material or were fully considered by the PTO Examiner. Finally, C & F asserts that there is no evidence of an intent to deceive. In fact, C & F suggests that the undisputed facts support a finding of judgment in its favor on this issue.

### 1. *Materiality*

■ Information is considered material if there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. *Merck & Co., Inc. v. Danbury Pharmacal, Inc.,* 873 F.2d 1418, 1421 (Fed.Cir.1989). Defendants contend that there is no question as to the materiality of the Holac Documents and Van Werven patent because the applicants specifically listed them among the information which in the applicants' own estimation was "believed material to the examination of the referenced application." (IDS, Defendants' Exh. L, B003140). C & F challenges the materiality of the Holac Documents and Van Werven patent on the grounds that they could not constitute prior art. This Court finds that both the Holac Documents and Van Werven patent were material information to the prosecution of the '094 patent.

This is a case where inequitable conduct is raised as a defense based on alleged misrepresentations of information provided to the Examiner in the IDS. C & F relies on cases where the alleged inequitable conduct involved the non disclosure of material information. *See Northern Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931 (Fed.Cir.1990);

---

**9.** Patent and Trademark Office Rules, Section 1.56, expressly forbids 1) the suppression of material facts known to the applicant which are inconsistent with the statement made in pursuit of the patent; 2) the omission of any material information; and 3) any affirmative misrepresentations of material information. 37 C.F.R. § 1.56(a) (1988).

*Akzo N.V. v. U.S. Intern. Trade Com'n,* 808 F.2d 1471 (Fed.Cir.1986). Since an applicant's duty to the PTO is one of good faith and candor it is apparent that an applicant may not misrepresent information it supplies. Thus, the relevant inquiry in this case is not whether the applicants failed to disclose relevant information but whether the applicants failed to adequately represent the information they did provide. The Holac Documents and Van Werven patent were included on the IDS therefore they are material.

■ The Court thus turns the inquiry to the issue of alleged misrepresentations to the Holac Documents and Van Werven patent which will each be addressed individually.

### a. Holac Documents

Defendants argue that the Holac Documents actually disclosed, among other things, that the Holac dicer could extrude and cut cooked meat products and could produce irregularly shaped food products with a "handmade appearance." Defendants suggest that this information directly contradicts the applicants' assertions that their invention differed from prior art because it involved a method of manufacturing "irregular, randomly shaped" pieces of cooked food product by extruding and cutting a cooked and cooled food product. Specifically, Defendants contend that the applicants misrepresented the information contained in the Holac Documents and thereby misled the Examiner.

In the IDS the applicants attached a copy of the Holac Brochure ('094 IDS, Defendants' Exh. L, B003159–B003160) with the following description:

> Illustrates and describes a Holac dicer which can be used to produce uniform cubes, strips or slices of meat or similar food products.

('094 IDS, Defendants' Exh. L, B003142).

Defendants argue that this description misrepresents the brochure because it doesn't state that the Holac dicer could produce different sized pieces of cooked food product using various rates of extrusion and grid size. (Marbeck Decl., pp. 5–6, Defendants' Exh. P; Quigg Decl., ¶ 1, Defendants' Exh. Q).

The applicants also attached a copy of the Kienzl Letter and Reinert Brochure (IDS, Defendants' Exh. L, B003152–B003157) with the following description:

> Illustrates and describes various meat and poultry products that can be diced on a Holac dicer. The meat or poultry products would be placed in a Holac dicer and cut into pieces conforming generally to the shape of the fixed grid cutting die illustrated in the photograph.

(IDS, Defendants' Exh. L, B003143).

Defendants argue that this description is a misrepresentation because it fails to inform that the Holac dicer could create pieces with a handmade appearance or that the letter attaches a photograph of an extrusion grid with irregular apertures. (IDS, Defendants' Exh. L, B003143).

The applicants further attached a copy of a past advertisement from NATIONAL PROVISIONER Magazine with the following description:

> Illustrates a dicing apparatus having a moveable lateral wall which acts as a loading chamber for meat, poultry or cheese products. The food product is subsequently cut into strips, cubes, slices or like regular shapes.

(IDS, Defendants' Exh. L, B003142).

Defendants contend that this description also misrepresents the relevance of this ad in that it failed to disclose that cooked foods, including meat and poultry, could be diced on a Holac dicer. In sum, Defendants allege that the applicants failed to make a candid description of these documents which led the Examiner away from their true relevance such that the Examiner failed to consider these documents in his review of the prior art.

C & F argues that these descriptions did not misrepresent or mischaracterize any information included in the IDS. First, none of the Holac Documents disclose a process. Second, the Holac Brochure and NATIONAL PROVISIONER and concern only production of uniform cubes, strips or slices. Third, the Kinzel Letter and Reinert Brochure do not disclose the production of irregularly shaped

pieces. Finally, C & F argues that, since these documents were referenced in the IDS, the Examiner had a duty to make an independent analysis of each reference. (*See* Banner Decl., Clark Decl.).[10]

Considering the evidence in the light most favorable to the nonmovant, C & F, this Court finds that the evidence does not support a clear and convincing finding that the applicants misrepresented the Holac Documents or misled the Examiner.

### b. Van Werven Patent

Defendants assert that the Van Werven patent actually disclosed a process wherein a cooked food product at a temperature of 5°–15° C. is extruded and then cut into random shapes with a cutter. In the IDS the applicants listed patent number 3,852,487 (Van Werven patent) and described its relevance thusly:

> Discloses a meat paste product and process for preparing such a product. A shaped consolidated meat paste suitable for canning, freezing or drying can be made by mixing finely divided raw meat and separated muscle fiber bundles in extruding the mixture after deaeration.

(IDS, Defendants' Exh. L, B003146).

C & F argues that Van Werven, in fact teaches away from the '094 patent in that it describes a warmer temperature for extrusion, it uses a nozzle rather than an extrusion plate and it produces pieces of food product for soups and entrees rather than hand formed pizza toppings. As to both the Holac Documents and the Van Werven patent, C & F contends that they were merely cumulative, and no more material than the information related by the rest of the references in the IDS.

Considering the evidence in a light most favorable to the non-movant, C & F, this court finds that there is not clear and convincing evidence that the applicants misrepresented or mischaracterized the Van Werven patent in the IDS.

### 2. *Intent*

The second threshold issue in inequitable conduct cases is intent. In inequitable conduct cases, intent "need not, and rarely can be, proven by direct evidence." *Merck*, 873 F.2d at 1422. Rather, intent is most often proven by a "showing of acts the natural consequences of which are presumably intended by the actor." *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1151 (Fed.Cir.1983).

Defendants argue that intent to mislead in this case can be inferred from "the way in which C & F brought the references to the examiner's attention." (Defendants' Reply, p. 12). Specifically, Defendants suggest that the applicants "buried the Holac Publications and Van Werven [patent] in a list of 31 references" and failed to describe them in the same detail as the other references. (Reply, p. 12).

The facts of this case do not support a finding of a "damning" "pattern of misrepresentation" as found in *Merck*. *Merck*, 873 F.2d at 1422. An examination of the IDS at issue in this case does not support a finding that the applicants buried the Holac Documents or the Van Werven patent or provided any less detailed descriptions than the surrounding references. In addition, the IDS recites that the applicants attached copies of all the referenced items, including the Holac Documents and the Van Werven patent, thus providing the Examiner with ample opportunity to review the actual documents for himself. Considering the evidence in the light most favorable to the nonmovant, C & F, this Court finds that Defendants have failed to prove either of the threshold issues required for an inequitable conduct finding by clear and convincing evidence and that, therefore material issues of fact exist on this subject.

---

10. The Court notes that C & F also supplied the declaration of Michael Warnecke as a patent law expert. The Court wishes to disclose that about the time this decision was being finalized it came to our attention that a summer extern in our office, Michael Warnecke, is the son of the aforementioned Michael A. Warnecke. Throughout his tenure Mr. Warnecke worked exclusively on two cases *Ra Chaka v. Givens*, 90 C 130 (a prisoner's rights suit) and *Capaldo v. Shalala*, 94 C 4150 (a social security disability appeal). Mr. Warnecke, the extern, was not apprised of the facts of this case or the ultimate recommendation nor has he performed any research on the issues involved. Further, the Court has determined that the declaration of Mr. Warnecke, the attorney, was not necessary for this recommendation.

## IV. CONCLUSION

For all the reasons previously delineated, this Court finds that there are genuine issues of material fact which preclude summary judgment for Defendants on the issue of infringement and the court finds that the undisputed facts fail to support a finding of inequitable conduct. For these reasons, the Court therefore recommends that Plaintiff's Motion to Strike Defendants' Reply and Defendants' Response to C & F's 12N Statement be denied, that Defendants' Motion for Summary Judgment on Infringement be denied, and that Defendants' Motion for Summary Judgment as to Inequitable Conduct be denied.